## S02A1688. COLUMBUS-MUSCOGEE COUNTY CONSOLIDATED GOVERNMENT et al. v. CM TAX EQUALIZATION, INC. et al.
### (579 SE2d 200)

HUNSTEIN, Justice.

CM Tax Equalization, Inc. and several individual residents of Columbus-Muscogee County brought suit challenging the constitutionality of a local constitutional amendment ("LCA") that affects the manner in which homestead property in Columbus-Muscogee County Consolidated Government (the County) is valued for ad valorem taxation purposes. The trial court granted summary judgment to plaintiffs, prompting the County government defendants to file this appeal. Because we agree with the County government appellants that the LCA is not unconstitutional for the reasons set forth by the trial court, we reverse.

Pursuant to the provision in the 1976 Constitution that authorized LCAs, see Ga. Const. 1976, Art. XXII, Sec. I, Par. I, the General Assembly in 1981 approved the County's LCA for the purpose of amending Art. VII, Sec. I, Par. III. The LCA provided that

> homestead property in Muscogee County shall be valued for purposes of ad valorem taxation for school and city-county consolidated government purposes based upon the fair market value of the property as of January 1, 1983; or as of January 1 of the first year when homestead exemption is allowed and claimed after January 1, 1983; or as of January 1 of the year following the last change of ownership after January 1, 1983, whichever is later.

---

[8] *Mosley v. State*, 145 Ga. App. 651, n. 1 (244 SE2d 610) (1978).

Ga. L. 1981, pp. 1926-1927. The LCA also provided for reassessment to current fair market value when the property is transferred at death to someone other than a spouse. Major improvements to a home are added to the frozen value. The "frozen" value applies only to County ad valorem taxation; the property is taxed at current fair market value for State ad valorem tax purposes. A substantial majority of the voters in the County voted in favor of the "Homestead Freeze" LCA in 1982. Ga. L. 1983, p. 5210.

The procedure for enacting new LCAs was not retained in the 1983 Georgia Constitution, but local governments could continue existing LCAs beyond July 1, 1987 by following the provisions set forth in Art. XI, Sec. I, Par. IV (a) of the 1983 Georgia Constitution. The County's Homestead Freeze LCA was continued in effect by the passage of a local law. Ga. L. 1986, p. 3800. Pursuant to a 1991 local act authorizing a local referendum on whether the LCA should be repealed, Ga. L. 1991, p. 4255, an overwhelming majority of County voters approved the referendum that continued the Homestead Freeze LCA. Ga. L. 1992, CCCLXXXVI.

1. The trial court held that the Homestead Freeze LCA is unconstitutional because it conflicts with the uniformity in taxation clause of the State Constitution. Art. VII, Sec. I, Par. III, Ga. Const. of 1983. The Homestead Freeze LCA's enabling legislation expressly reflects that it was intended to amend that clause. Ga. L. 1981, p. 1926.[1] Although the trial court ruled that the LCA amounted to nothing more than a local law, which could not legally conflict with any earlier-enacted constitutional provision, this ruling fails to recognize that the State Constitution specifically provides that those pre-existing LCAs that were not repealed as provided in Art. XI, Sec. I, Par. IV (a) of the Constitution "shall be continued in force and effect as a part of this Constitution." Id. at (b).

This Court has recognized the continued constitutional status of those LCAs that have not been repealed as provided in Art. XI, Sec. I, Par. IV (a). See, e.g., Copeland v. State of Georgia, 268 Ga. 375 (490 SE2d 68) (1997). As we held in Copeland,

When an amendment to the Constitution has been proposed by the General Assembly and ratified by the voters, the amendment will not be declared void on the ground that it does not accord with some other provision of the same Constitution. If an amendment, duly adopted, is in conflict with

---

[1] Both Art. VII, Sec. I, Par. III (a) of the 1983 Georgia Constitution and Art. VII, Sec. I, Par. III of the 1976 Georgia Constitution address the uniformity of taxation and provide, in identical language, that "all taxation shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax."

some previous provision, the amendment, being the last expression of the sovereign will of the people, will prevail as an implied modification pro tanto of the former provision. [Cits.] This means that an amendment will not be ineffectual or invalid merely because it conflicts with existing provisions. [Cits.]

Id. at 379-380 (4). Hence, in *Copeland* we upheld an LCA authorizing the issuance of certain revenue bonds over the claim that the LCA was in conflict with Art. IX, Sec. V, Par. I (the debt limitations clause), Art. IX, Sec. VI, Par. I (the general revenue bond provisions specifying that revenue bonds are repayable only from project revenues), and the gratuities clause, Art. IX, Sec. II, Par. VIII of the 1983 Ga. Const.

Applying our rationale in *Copeland* to the instant case, we conclude that because the Homestead Freeze LCA in issue here was a subsequent amendment to the uniformity clause, Art. VII, Sec. I, Par. III, and because the LCA continues in force and effect as part of our State Constitution, Art. XI, Sec. I, Par. IV (b), the County's Homestead Freeze LCA is valid despite any conflict with the uniformity clause.[2] See *Copeland*, supra. Compare *Bradford v. Wells*, 262 Ga. 198 (415 SE2d 638) (1992) (LCA affecting election terms of county officials did not encompass county school superintendent so LCA did not conflict with school superintendent election provision in Constitution).

2. The trial court held that the Homestead Freeze LCA violated the equal protection clauses of the State and Federal Constitutions.

(a) When a classification does not impact a fundamental right or operate to the disadvantage of a suspect class, the disparate treatment caused by the classification must meet only the rational relationship test. *Grissom v. Gleason*, 262 Ga. 374 (3) (418 SE2d 27) (1992). Under that test, classifications are "permitted when the classification is based on rational distinctions and bears a direct relationship to the purpose of the legislation. [Cit.]" Id. at 377 (3).

In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, [cit.], the legislative facts on which the classification is

---

[2] This rationale also controls the trial court's ruling that the Homestead Freeze LCA unconstitutionally conflicts with Art. VIII, Sec. VI, Par. I (a), although in this regard we note that school tax is required to be levied only "upon the assessed value of all taxable property within the territory served by said school system," id., and we have defined "assessed value" to mean "the correctly assessed value (i.e., the assessed value approved by the revenue commissioner), not an incorrectly assessed value." *Bd. of Commrs. of Newton County v. Allgood*, 234 Ga. 9, 17 (7) (214 SE2d 522) (1975).

apparently based rationally may have been considered to be true by the governmental decisionmaker, [cit.], and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. [Cit.] This standard is especially deferential in the context of classifications made by complex tax laws. "[I]n structuring internal taxation schemes 'the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.' " [Cits.]

*Nordlinger v. Hahn*, 505 U. S. 1, 11-12 (112 SC 2326, 120 LE2d 1) (1992). In *Nordlinger*, the United States Supreme Court upheld California's acquisition-value based property tax system (known as Proposition 13) against an equal protection challenge, finding that the policies underlying the system promoted the rational, legitimate governmental purposes recognized by the Court, i.e., the encouragement of neighborhood preservation, continuity and stability, id. at 12, and the protection of the reliance interests of existing homeowners. Id. at 12-13. Because Proposition 13 was not "palpably arbitrary," id. at 18, the *Nordlinger* Court concluded that the California tax scheme was not unconstitutional.

The record in this case establishes that the very same policies identified in *Nordlinger* underlie the acquisition-value taxation scheme authorized by the Homestead Freeze LCA. Moreover, by explicitly amending the uniformity in taxation clause, see Ga. L. 1981, p. 1926, the LCA adopted a taxation scheme different from that specified by Art. VII, Sec. I, Par. III and general revenue statutes. Compare *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County*, 488 U. S. 336, 343 (109 SC 633, 102 LE2d 688) (1989). Nevertheless, the trial court rejected the holding in *Nordlinger* and concluded that the taxation scheme in issue here was unconstitutional for the reasons set forth in *Allegheny Pittsburgh*, supra. The *Nordlinger* Court, however, distinguished *Allegheny Pittsburgh* on the basis that no evidence indicated the Webster County's taxation scheme was founded upon the rational government purposes recognized by the Court in *Nordlinger* or that Webster County intended to adopt a taxation scheme that varied in practice from the uniformity standards set forth in West Virginia's constitution and statutes.[3] "*Allegheny Pittsburgh* was the rare case where the facts precluded

---

[3] The *Nordlinger* Court found significant the fact that in *Allegheny Pittsburgh* the purpose for the Webster County taxation scheme was to assess properties at their "true current value" and that there was " 'no suggestion' that 'the State may have adopted a different system in practice from that specified by statute,' [cit.]" id. at 15, given that West Virginia's constitution and statutes required a uniform tax rate throughout the state.

any plausible inference that the reason for the unequal assessment practice was to achieve the benefits of an acquisition-value tax scheme." (Footnote omitted.) Id. at 16.

We find the Homestead Freeze LCA distinguishable from *Allegheny Pittsburgh* on the same grounds explicated by the U. S. Supreme Court in *Nordlinger*. As was the case with Proposition 13, the Homestead Freeze LCA "was enacted precisely to achieve the benefits of an acquisition-value system." Id., 505 U. S. at 16. Although appellees and the trial court point to several factual differences between California's Proposition 13 tax system and the homestead freeze system implemented by the LCA[4] as grounds to distinguish *Nordlinger*, we find none of those differences to be critical to the application of the U. S. Supreme Court's rationale in *Nordlinger* to the instant case. We thus conclude that the Homestead Freeze LCA is not unconstitutional under a rational relationship equal protection analysis because of the classifications it draws among homeowners based upon purchase-date classification or because of the separate classification of homeowners and renters.[5]

(b) The trial court, while properly applying the rational relationship test, also "look[ed] at who is most harmed by the system" in weighing whether the Homestead Freeze LCA was violative of equal protection and listed among the persons disadvantaged by operation of the LCA "young people, people in transition,[6] the working poor, and, perhaps, racial minorities."[7] As to racial minorities, the trial court found only that they were "probable victims" of the County's

---

[4] Appellees point to, inter alia, the fact that Proposition 13 applies throughout all of California to all properties, both residential and commercial, and that it does not completely freeze valuation but places an annual two percent inflationary cap. The only distinction discussed by the trial court was that the County allows a homestead exemption, which it increased from $6,237 in 1983 to $13,500 in 1992.

[5] The trial court pointed to renters in its conclusion that the LCA is unconstitutional on the basis that lessees arguably had to pay higher rents when lessors, as owners of commercial property not included in the homestead freeze, passed along the increased tax burden.

[6] For discussion of the Homestead Freeze LCA's effect upon a constitutional right to travel, see Division 4, infra.

[7] Although the trial court's language would seem to implicate the heightened equal protection test of strict scrutiny for classifications involving suspect classes, see generally *Barnett v. State*, 270 Ga. 472 (510 SE2d 527) (1999), we do not find strict scrutiny appropriate in this case. A facially neutral law, such as the LCA here, warrants strict scrutiny "only if it can be proved that the law was 'motivated by a racial purpose or object,' [cit.], or if it is '"unexplainable on grounds other than race."' [Cit.]" *Hunt v. Cromartie*, 526 U. S. 541, 546 (119 SC 1545, 143 LE2d 731) (1999). The trial court here made no explicit finding that the Homestead Freeze LCA has a disparate impact on racial minorities that could ultimately be traced to a racially discriminatory purpose. See *Washington v. Davis*, 426 U. S. 229, 240 (96 SC 2040, 48 LE2d 597) (1976). Our review of the totality of the relevant facts adduced in the record fails to reveal that the Homestead Freeze LCA was enacted "at least in part 'because of,' not merely 'in spite of,' its adverse effects" upon an identifiable suspect group. See *Personnel Administrator of Massachusetts v. Feeney*, 442 U. S. 256, 279 (99 SC 2282, 60 LE2d 870) (1979).

taxation scheme, looking to statistics reflecting that racial minorities in the County tend to be in the lower income brackets. However, it is uncontroverted that the Homestead Freeze LCA applies to all homeowners regardless of income. As appellees concede in their brief, the LCA is based "solely on acquisition date and gives no consideration to income or ability to pay." The record thus establishes that all homeowners benefit from the LCA's inflation control measure, including those homeowners in racial minorities in lower income brackets who are shielded by the LCA from the adverse side effects of gentrification in their neighborhoods. See *Nordlinger*, supra, 505 U. S. at 12 (recognizing the legitimate State purpose of structuring a tax system "to inhibit displacement of lower income families by the forces of gentrification"). We disagree with the trial court's ruling that the Homestead Freeze LCA violates equal protection because "racial minorities have had less success than their white economic counterparts in obtaining the financing necessary to purchase homes," given the absence of any evidence in the record that the LCA adversely affects either the fair market value of homes offered for sale within the County or the ability of racial minorities to obtain financing for the purchase of those homes.

As to the adverse effect on young people and the working poor, the *Nordlinger* Court rejected the argument that the California taxation scheme was unconstitutional because of its adverse impact upon many "younger and poorer California families." Id. at 17 (III). While potential homeowners may be discouraged from purchasing homes by the prospect of paying taxes assessed to current values (at least as of the year of purchase), this does not render the Homestead Freeze LCA unconstitutional. As the U. S. Supreme Court stated:

> the State legitimately can conclude that a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher taxes as does an existing owner. The State may deny a new owner at the point of purchase the right to "lock in" to the same assessed value as is enjoyed by an existing owner of comparable property, because an existing owner rationally may be thought to have vested expectations in his . . . home that are more deserving of protection than the anticipatory expectations of a new owner at the point of purchase. A new owner has full information about the scope of future tax liability before acquiring the property, and if he thinks the future tax burden is too demanding, he can decide not to complete the purchase at all. By contrast, the existing owner, already saddled with his purchase, does not have the option of deciding not to buy his home if taxes become pro-

hibitively high. . . . In short, the State may decide that it is worse to have owned and lost, than never to have owned at all.

Id. at 12-13.

The Homestead Freeze LCA did not violate the equal protection clauses of the State and Federal Constitutions for the reasons set forth by the trial court.

3. Under the applicable rational basis test, see generally *State of Georgia v. Old South Amusements*, 275 Ga. 274, 277-278 (564 SE2d 710) (2002), we likewise conclude that the Homestead Freeze LCA does not violate the due process clauses of the State and Federal Constitutions.

4. Finally, because there is no cut-off date or durational residence requirement in the LCA, we find distinguishable the cases relied upon by the trial court when it held that the Homestead Freeze LCA violates the right to travel guaranteed by the Federal Constitution. See *Hooper v. Bernalillo County Assessor*, 472 U. S. 612 (105 SC 2862, 86 LE2d 487) (1985) (preferential tax treatment accorded veterans residing in state prior to set date but not to those veterans who moved into state after that date); *Memorial Hospital v. Maricopa County*, 415 U. S. 250 (94 SC 1076, 39 LE2d 306) (1974) (one year residency requirement for receipt of indigent health benefits). Nothing in the Homestead Freeze LCA treats new arrivals to the County any differently from long-term County residents seeking to purchase a home there. See *Zobel v. Williams*, 457 U. S. 55, 60 n. 6 (102 SC 2309, 72 LE2d 672) (1982) (right to travel analysis refers to little more than a particular application of equal protection analysis). We agree with appellants that the trial court's reasoning is flawed and that the Homestead Freeze LCA is not unconstitutional on this basis. See *In re Initiative Petition No. 362 State Question 699*, 899 P2d 1145, 1152 (II) (B) (Okla. 1995).

*Judgment reversed. All the Justices concur, except Benham, J., who dissents.*

DECIDED MARCH 24, 2003.

*Troutman Sanders, Harold G. Clarke, Charles F. Palmer, William M. Droze, Clifton C. Fay*, for appellants.

*Sutherland, Asbill & Brennan, Randolph W. Thrower, Teresa W. Roseborough, Thomas W. Curvin, Stacey Y. Abrams, Ellis, Easterlin, Gatewood, Shipper & Farr, George R. Ellis, Jr.*, for appellees.